3:24-mj-00269

**DISTRICT OF OREGON: ss, AFFIDAVIT OF BOBBY GUTIERREZ**

## Affidavit in Support of a Criminal Complaint

I, Bobby Gutierrez, being first duly sworn, hereby depose and state as follows:

## Introduction and Agent Background

1. I am a Special Agent with the Federal Bureau of Investigation and have been since January 2021. I am currently assigned to the FBI's Portland Division and am part of the Transnational Organized Crime and Violent Gang Squad. I presently work a variety of criminal and national security matters, including the investigation of violent crimes, gangs, and narcotics, in addition to the apprehension of federal fugitives. During my 21-week training at the FBI Academy in Quantico, Virginia, I received training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. In my current area of responsibility, I work with law enforcement officers who have experience and training in investigating coded communication involving the distribution of controlled substances and gang affiliations. I have used this training and experience, as well as the training and experience of other law enforcement officers familiar with this investigation, to demonstrate how these criminal enterprises plan, organize, and carry out criminal activity.

2. Prior to being employed with the FBI, I was a Licensed Master Social Worker (LMSW) in the state of Arizona for approximately six years. As a LMSW, I was responsible for creating and implementing target treatment plans for court-ordered criminal offenders with a chronic history of substance use disorders, domestic violence, and child abuse. In addition to my employment as an LMSW, I was a behavioral health consultant for Medicare/Medicaid and oversaw medical and mental health treatment for patients residing in assisted living homes and

skilled nursing facilities. As a consultant, I was responsible for auditing medical treatment plans, levels of care, and medications to include psychotropic and Schedule II narcotic pain medications.

3. This affidavit is based upon a joint investigation conducted by the Clackamas County Interagency Task Force (CCITF), the Federal Bureau of Investigation (FBI), and the U.S. Attorney's Office.

**Purpose of Affidavit**

4. This affidavit is submitted to support a criminal complaint and arrest warrant for William James O'Donnell, a Caucasian male, date of birth 07/xx/1962 (hereinafter referenced as "**O'DONNELL**") for committing the crime of distribution of a controlled substance, to-wit: a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, resulting in death and serious bodily injury, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(C).

5. I have obtained the facts set forth in this affidavit through my personal participation in the investigation described below; from oral and written reports of other law enforcement officers; and, from records, documents, and other evidence obtained during this investigation. I have obtained and read official reports prepared by law enforcement officers participating in this investigation and in other related investigations.

**Statement of Probable Cause**

6. On December 15, 2024, at approximately 3:54 a.m., the Clackamas County Sheriff's Office (CCSO), along with members of CCITF, responded to a call involving three suspected drug overdoses that occurred inside an apartment located at the Clackamas Trails Apartments on SE Cook Ct., Portland, Oregon. The three victims are identified as Adult Victim-1 (AV-1), Adult Victim-2 (AV-2), and Adult Victim-3 (AV-3). It was reported that these three

subjects had overdosed and were unconscious. Clackamas County Fire personnel also arrived at the listed location and attempted to perform life saving measures on the three overdose victims, which included needing to use multiple doses of Narcan on all three subjects, as well as performing CPR on AV-1. The Narcan appeared to have a positive response on AV-2 and AV-3, although it took multiple doses for this to occur. I know from training and experience that Narcan, known pharmaceutically as Naloxone, is only used to reverse the deadly effects of opiate (such as fentanyl) overdoses as it blocks the effects of opiates on the brain. While sometimes a single dose of Narcan will stop a opiate overdose, depending on the amount, potency, and presence of other additives within the opiate, multiple doses may be required and sometimes they may not be successful. An Investigator reported that AV-2 was not breathing when they first responded to the scene. The three victims were subsequently transported to local hospitals for emergency life-saving medical care. AV-1, after arriving at the hospital, was pronounced deceased. AV-2 and AV-3, after continued medical life-saving efforts, recovered.

7. Investigators at the residence began to process the scene in search of evidence. Inside the residence Investigators located a plastic bindle of a white powdery substance, as well as the cellular phones belonging to AV-1 and AV-2. The plastic bindle contained a white powdery substance that was field tested using MobileDetect and returned a positive (+) result for the presence of fentanyl, a Schedule II controlled substance. I have found MobileDetect to be a reliable way to field test controlled substances with subsequent forensic analysis regularly confirming the initial results.

8. Inside the residence, in AV-1's bathroom next to the sink, Investigators found a glass makeup container. In AV-1's bathroom cabinet Investigators found an orange and black silicone container with white residue. Inside AV-1's bedroom dresser Investigators found a dollar

bill rolled into a tube with white residue inside it. I know from my training and experience that users of some drugs, to include cocaine, often roll up U.S. Currency to use as a tube to inhale the drug nasally. Residue within the glass makeup container and orange and black silicone container were both field tested with the MX908 (a drug detection device) and returned a positive (+) result for cocaine. The dollar bill was also tested with the MX908 and it tested positive (+) for cocaine and methamphetamine.

9. As the investigation continued, Investigators followed up with AV-2 and AV-3 to gather more information. While at the hospital Investigators heard medical personnel tell AV-2 that she was lucky to be alive due to the condition she was in when she was admitted to the hospital. AV-2 agreed to talk to Investigators and provided the following:

- AV-2 said she was with AV-1 on the night of December 14, 2024, and both used cocaine at AV-1's residence that evening.
- After running out of cocaine, AV-1 reached out to her regular source of supply who told AV-1 they were out.
- AV-1 then reached out to another drug source of supply who in turn provided her with another drug source, later identified as **O'DONNELL**, for her to contact.
- AV-2 said that she and AV-1 then drove together to **O'DONNELL's** residence, at XXXX SE Ellis Street, Portland, Oregon, 97206 (hereinafter "Target Location"), to obtain more cocaine.
- AV-2 said that when they arrived at the residence she witnessed other people within the kitchen area of the Target Location smoking an unknown drug on foil. I know this is a common way for people to consume fentanyl.

- AV-2 said that AV-1 purchased either a half (1/2) of a gram or one (1) gram of purported cocaine from **O'DONNELL** and that AV-1 told him she would pay him later for the purported cocaine he provided, but she did not recall the agreed upon price. AV-2 said that **O'DONNELL** provided them the suspected cocaine in tinfoil packaging.
- AV-2 said that after AV-1 and **O'DONNELL** completed the narcotics deal at the Target Location, AV-1 and AV-2 took the suspected cocaine back to AV-1's residence, where AV-3 later arrived.
- AV-2 said AV-1 was the first to snort the purported cocaine, followed by AV-2, and then AV-3.
- AV-2 said that when she inhaled the line of purported cocaine, she noticed the smell was different from any of her past experiences with cocaine use and she immediately did not feel right.
- AV-2 said she then became dizzy and fell backwards, but was caught by AV-3. AV-2 told Investigators that the next thing she remembered is waking up in the ambulance.
- AV-2 said she was told by medical staff that she was not breathing when the Investigators first found her and that she was lucky to be alive.

10. Investigators followed up with AV-3 to gather information on the day of the incident. AV-3 agreed to talk to Investigators and provided the following:

- AV-3 told Investigators he was supplied the drugs that night by AV-1 believing it was cocaine.

- AV-3 said he used marijuana and methamphetamine prior to using the suspected cocaine.
- AV-3 said he believed the marijuana, or the purported cocaine he consumed was laced with fentanyl due to the way it made him feel.
- AV-3 said he knew something was wrong because he felt extremely dizzy which had not happened with his past experiences with those drugs. AV-3 believes he passed out and remembers waking up in the hospital emergency room.

11. Using the information above, Investigators utilized law enforcement databases to search for **O'DONNELL** and discovered that **O'DONNELL** had multiple arrests for unlawful delivery of heroin. Additionally, **O'DONNELL's** Oregon license showed his address to be the same as the Target Location. The same Target Location had several reports from citizens regarding suspected drug activity within the last year. Investigators had also showed AV-2 a photo of **O'DONNELL** and she positively identified him as the person who provided AV-1 the purported cocaine.

12. After identifying the Target Location as the suspected address for **O'DONNELL,** Investigators followed up by conducting interviews near the vicinity of the Target Location. One of the neighbors agreed to talk to Investigators and told them that they suspected **O'DONNELL** to be a drug dealer given the amount of people coming and going from the Target Location. The same neighbor provided Investigators with security footage which captured recordings looking in the direction of the Target Location. While searching in the late hours of December 14, 2024, and into the early hours of December 15, 2024, Investigators observed two females, who Investigators identified as AV-1 and AV-2, arrive at the Target Location in the early morning hours of

December 15, 2024, in AV-2's vehicle. The two suspected victims went into the Target Residence, stayed for less than 30 minutes, and then departed.

13. Using the phones that were obtained from the day of the overdose, specifically the one belonging to AV-1, Investigators began to search for additional evidence. I know from training, experience, and my conversations with Investigators who possess years of experience investigating drug overdoses that a cellular phone often possesses conversations between the drug dealer and the drug user (who, in this situation, is deceased). The communication between the dealer and the user commonly consists of time, location, amounts, prices, and phone numbers of individuals involved in the transaction.

14. A search of AV-1's phone revealed a video was taken during the same time when both AV-1 and AV-2 had arrived at the Target Location. Investigators noticed that the geolocation of the video was at the Target Location.

15. In the following days, Investigators began to conduct surveillance near the Target Location in an attempt to make contact with **O'DONNELL.** On December 17, 2024, Investigators observed a blue Volvo sedan park near the curb of the Target Location which was occupied by two unknown males. Investigators were able to positively identify the passenger as **O'DONNELL** and shortly thereafter, boxed the vehicle to avoid the vehicle from attempting to escape. Both the driver and the passenger, later identified as William James **O'DONNELL,** were detained.

16. A search of **O'DONNELL's** person revealed a baggie containing a white powdery substance inside his right coin pocket, a brown bindle also in his right coin pocket, a clear baggie with white powder residue, and a glass jar container with a white powder residue. **O'DONNELL** was advised of his constitutional *Miranda* rights at the scene and told Investigators he would

remain silent. The driver, referred to as Adult Witness 1, was also searched and read his *Miranda* rights. Adult Witness 1 agreed to talk to Investigators and provided the following:

- Adult Witness 1 said he was the caregiver for **O'DONNELL** and drove him to various locations.
- Adult Witness 1 said **O'DONNELL** was made aware of an overdose and wanted to leave the Target Location due to stress.
- Adult Witness 1 said **O'DONNELL** was a heroin and cocaine user. Adult Witness 1 said **O'DONNELL** used fentanyl test strips to test his product for the presence of fentanyl.
- Adult Witness 1 said he had to use Narcan on an individual at the Target Location in the past.

17. While Investigators held the scene, they obtained a search warrant of the Target Location. Inside the residence, Investigators discovered 0.2 grams of cocaine, cocaine residue, fentanyl testing strips, and Narcan.

18. Upon the completion of the search, evidence seized was taken back for field testing, measurements, and processing to the Clackamas County Sheriff's Office evidence room. The clear baggie with residue and glass jar with residue was weighed, and field tested using MobileDetect and returned positive (+) for fentanyl. The white powdery substance inside his right coin pocket was tested using MobileDetect and returned positive (+) for cocaine. In summary, the total amount of drugs seized from **O'DONNELL** weighed a total of approximately 19.3 grams, to include packaging materials. Below is a photo of some of the items seized from **O'DONNELL's**:







19. I was asked to assist with the interview of **O'DONNELL** along with CCITF Investigator, Trevor Wolf. I explained to **O'DONNELL** the circumstances involving the investigation and the information leading to his arrest. **O'DONNELL** nodded and invoked his rights, and the interview was terminated. **O'DONNELL** was later lodged at the Multnomah County Detention Center.

20. I am very familiar with fentanyl and know that it is a synthetic opioid that is approximately 100 times more potent than morphine and 50 times more potent then heroin and is

listed as a Schedule II controlled substance. Medically, under the direction of a doctor, it is used to treat severe pain or to manage pain after surgery, and is sometimes used to treat patients with chronic pain. Illicit fentanyl, primarily manufactured in foreign clandestine labs and smuggled into the United States through Mexico, is being distributed across the country and sold on the illegal drug market. According to the Centers for Disease Control and Prevention, synthetic opioids (like fentanyl) are the primary driver of overdose deaths within the United States. In high enough doses, fentanyl can cause breathing to stop, resulting in death. Illicit fentanyl is also sometimes mixed in with other drugs, to include heroin or cocaine, which amplifies its potency and potential danger. I know that as little as two (2) milligrams of fentanyl can be a fatal dose.

## Conclusion

21. Based on the foregoing, I have probable cause to believe, and I do believe, that William James O'Donnell has committed the crime of distribution of a controlled substance, to-wit: a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, resulting in death and bodily injury, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(C). I therefore request that the Court issue a criminal complaint and arrest warrant for **O'DONNELL.**

///

///

///

22. Prior to being submitted to the Court, this affidavit, the accompanying complaint, and the arrest warrant were all reviewed by Assistant United States Attorney Scott M. Kerin. AUSA Kerin advised me that in his opinion the affidavit and complaint are legally and factually sufficient to establish probable cause to support the issuance of the requested criminal complaint and arrest warrant.

*By phone pursuant to Fed R. Crim. P. 4.1*
Bobby Gutierrez Special Agent
Federal Bureau of Investigation

Subscribed and sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at 8:30 pm on December 18, 2024.

Jolie A. Russo
HONORABLE JOLIE A. RUSSO
UNITED STATES MAGISTRATE JUDGE