SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**SCOTT M. KERIN, OSB #965128**
Scott.Kerin@usdoj.gov
**STEVEN CHAMBERLIN, TXSB #24095296**
Steven.Chamberlin@usdoj.gov
Assistant United States Attorneys
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:26-cr-00034-JAM** |
| **v.** | **GOVERNMENT'S TRIAL MEMORANDUM** |
| **WILLIAM JAMES O'DONNELL,** | **Trial: October 13, 2026** |
| **Defendant.** | |

The United States of America, by Scott E. Bradford, United States Attorney for the District of Oregon, through Scott Kerin and Steven Chamberlin, Assistant United States Attorneys (AUSAs) for the District of Oregon, provides this memorandum addressing issues related to trial in the above-entitled matter.

## I. PROCEDURAL BACKGROUND

Defendant is charged with Distribution of Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). ECF No. 71. The indictment includes a forfeiture allegation.

///

A six-day jury trial is scheduled to begin on October 13, 2026. The government is ready for trial.

## II. FACTUAL BACKGROUND

### A. Overdose Investigation and Determination of Probable Cause

In the evening of December 14, 2024, Adult Victim 1 and Adult Victim 2 were hanging out at Adult Victim 1's apartment.[1] Adult Victim 1 and Adult Victim 2 were partying together, using a small amount of cocaine, and consuming alcohol. Also, present at the apartment was Mother of Adult Victim 1 and Adult Victim 1's minor daughter. After a period of time, Adult Victim 1 and Adult Victim 2 ran out of cocaine and decided they wanted to find more. Adult Victim 1 made a few calls, the first was to her normal source of supply, who told her he was out of cocaine. Adult Victim 1 then called and texted her father (Father of Adult Victim 1). Following those calls and text messages to her father, in early in the morning of December 15, 2024, Adult Victim 1 and Adult Victim 2 drove to the defendant's residence.

Video footage, from a neighbor's security camera located across the street from the defendant's residence, shows that around 12:36 a.m. the Father of Adult Victim 1 arrived and parked in front of the defendant's house. Shortly thereafter, Adult Victim 1 and Adult Victim 2 arrive in a separate car and parked on the opposite side of the street from the defendant's residence. The video footage shows the Father of Adult Victim 1 walking up to and entering the defendant's residence. The same video footage then shows Adult Victim 1 and Adult Victim 2 getting out of their car and walking towards the defendant's residence. The video footage stops before they enter the residence.

///

[1] The government is filing the names of Adult Victim 1, Adult Victim 2, Adult Victim 3, and the Mother of Adult Victim 1 and Father of Adult Victim 1 under seal in a separate filing.

Both Adult Victim 2 and the Father of Adult Victim 1 will testify that they went into the defendant's residence, which Adult Victim 2 describes as an active drug house in which people were using drugs inside the residence, to include a group of people smoking something off of pieces of foil in the kitchen, which is a typical way to consume fentanyl. Adult Victim 1 and Adult Victim 2 walked through the house to a back bedroom where they met the defendant. In the bedroom Adult Victim 2 will testify that the defendant handed Adult Victim 1 a piece of foil containing what they believed was cocaine. According to Adult Victim 2, after Adult Victim 1 received the purported cocaine from the defendant they then left the residence. Based upon the neighbor's video surveillance footage the women left the defendant's residence around 12:57 a.m. Law enforcement were able to confirm from geolocation data on Adult Victim 1's cell phone that she was at the defendant's residence that night.

Adult Victim 1 and Adult Victim 2 then drove back to Adult Victim 1's apartment, which she shared with her mother (Mother of Adult Victim 1). When they arrived at the apartment Adult Victim 3 was present as well. Adult Victim 1 and Adult Victim 2 asked Adult Victim 3 if he wanted to do a "bump," a reference to using a small amount of cocaine, and he agreed to join the women and do so. Adult Victim 1, Adult Victim 2, and Adult Victim 3 at this time were all inside Adult Victim 1's bedroom. Adult Victim 1 emptied the white powdery contents of the tinfoil they obtained from the defendant, which they still believed was cocaine, into the small baggie that originally contained the cocaine they had been using earlier that evening. Adult Victim 1 made three lines of the purported cocaine on the back of a cell phone and then Adult Victim 1, Adult Victim 2, and Adult Victim 3 each snorted some of the purported cocaine. Adult Victim 1 went first, followed by Adult Victim 3, and then Adult Victim 2. Adult Victim 3 knew something was wrong as he felt extremely dizzy upon consuming the drugs. Adult Victim 2

reported that after snorting some of the purported cocaine she immediately did not feel right and that the purported cocaine smelled different than normal. Adult Victim 2 reported that she then fell backwards. Both Adult Victim 2 and Adult Victim 3 then remember waking up in the presence of medical personnel who were treating them for their overdoses.

The Mother of Adult Victim 1 was also present at the apartment when Adult Victim 1 and Adult Victim 2 returned. Shortly after Adult Victim 1, Adult Victim 2, and Adult Victim 3 went into the bedroom and closed the door, the Mother of Adult Victim 1 heard a noise coming from Adult Victim 1's bedroom and she entered to find the three people (Adult Victim 1, Adult Victim 2, and Adult Victim 3) lying unconscious and she called 911. A call was made for medical assistance from the apartment at 3:49 a.m. on December 15, 2024. Fire Department, ambulance, and law enforcement personnel all responded to the apartment. Clackamas Fire District paramedic Tyler Dickerson will testify that fire and ambulance personnel immediately started life saving measures on all three people, including performing CPR and administering Narcan to them. Paramedic Dickerson will also testify that Narcan is an opioid antagonist that is designed to reverse the effects of an opioid overdose. Adult Victim 2 and Adult Victim 3 responded positively to Narcan and were revived, which indicated to Paramedic Dickerson that both had consumed and overdosed on fentanyl or a similar opioid. Adult Victim 1 did not respond to Narcan. All three individuals were transported to local hospitals. Adult Victim 2 and Adult Victim 3 were treated at the hospital and eventually discharged. Adult Victim 1 was unable to be revived and pronounced deceased at 5:57 a.m. at Kaiser Sunnyside Hospital.

While at the scene of the three overdoses, Deputy Russell Palmeri, from the Clackamas County Sheriff's Office, searched Adult Victim 1's bedroom and inside a drawer next to the mirror in the bedroom found a small plastic baggie containing a white powdery substance, which

he seized and field tested. The field test returned a positive result for fentanyl. The contents of that small plastic bag were also later analyzed by Marcela Moenne-Loccoz, a forensic scientist with the Oregon State Police (OSP) Forensic Laboratory who determined the contents were a mixture of cocaine and fentanyl, with a net weight of approximately .61 grams. Adult Victim 2 has identified this small plastic bag as the bag in which Adult Victim 1 placed the purported cocaine they purchased from the defendant.

Adult Victim 2 was interviewed in the hospital and, after describing the events of that evening, she was shown a photograph of the defendant. Adult Victim 2 positively identified the defendant as the person who supplied them with the drugs that night.

On December 15, 2024, around 12:10 p.m. law enforcement began surveilling the defendant's residence in Portland, Oregon. Around 2:09 p.m. the defendant was seen leaving his residence in a Volvo sedan with a suitcase, backpacks, and a walker.

**B. Defendant's Arrest and Interview**

On December 17, 2024, around 6:30 p.m. the defendant returned to his residence. Investigators observed a blue Volvo sedan drive towards the defendant's residence which was occupied by two males. After the vehicle parked Investigators contacted both individuals and positively identify the driver as Mason Magistrale (Magistrale) and the passenger as the defendant. The defendant was arrested and invoked his right to remain silent. When the defendant was arrested he was found in possession of small amounts of cocaine and fentanyl.

Magistrale was interviewed and stated the defendant left his residence on December 15, 2024, due to hearing about someone overdosing. Magistrale confirmed the defendant was both a drug dealer and user of cocaine and heroin. Magistrale confirmed the defendant tested his cocaine for fentanyl by using fentanyl testing strips.

Law enforcement then executed a search warrant on the defendant's residence and inside they found small amounts of fentanyl, heroin, and cocaine. Additionally, Investigators found Narcan and fentanyl test strips inside the defendant's residence.

**C. Medical and Forensic Examination**

As noted in the Government Expert Witness Disclosures, OSP Medical Examiner Dr. Nicole Stanley will testify regarding the results of an autopsy she performed upon Adult Victim 1, including that fentanyl was found in Adult Victim 1's body, and the cause of death was ethanol and mixed drug toxicity (fentanyl and cocaine).

OSP Forensic Chemist Crystal Hart will testify regarding her toxicological examination of a blood specimen taken from Adult Victim 1 on December 15, 2024, and the results of her analysis which concluded Adult Victim 1 had 9.8 ng/mL of fentanyl and 870 ng/mL of Benzoylecgonine (a cocaine metabolite) in her blood.

OSP Forensic Chemist Moenne-Loccoz will testify about the examinations she performed on multiple items which had been recovered from Adult Victim 1's apartment, the defendant's person, the defendant's residence, and the results from her analysis of those items.

## III. ELEMENTS OF THE OFFENSES

Defendant is charged by indictment with one count alleging the Distribution of Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C).

**A. Count 1: Distribution of Fentanyl (21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C))**

The elements of Count 1 are the following:

> First, on or about December 15, 2024, the defendant knowingly and intentionally distributed a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance; and,

> Second, the defendant knew that it was fentanyl or some other federally controlled substance.

Model Jury Instr. for the Ninth Circuit, § 12.1 (2024) (modified).

## IV. WITNESSES AND EXHIBITS

Simultaneous with the filing of this Trial Memorandum, the government is filing a witness list identifying thirty (30) potential trial witnesses. These witnesses were previously provided to defense counsel at the status hearing. The government has also filed an Expert Witness Disclosure notice for four (4) of the witnesses. The government is planning to offer approximately 45 exhibits in the form of video, photographs, physical exhibits, lab reports, and records. Those numbers may change based on stipulations, defense arguments, and pretrial rulings.

### A. Expert Witnesses

On September 17, 2026, the Government filed its Notice of Expert Testimony that describes the anticipated testimony of Oregon State Police Crime Lab (OSP) forensic scientist Marcella Moenne-Loccoz; OSP forensic scientist (toxicology) Crystal Hart; OSP medical examiner Dr. Nicole Stanley; and, Clackamas Fire District paramedic Tyler Dickerson. This number may be decreased depending on potential stipulations (*e.g.*, drug identification and quantity) or increased based upon defendant's trial submissions. Federal Rule of Evidence 702 provides that "if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert "may testify thereto." F.R.E. 702.

///

///

**B. Civilian Witnesses**

The Government expects Adult Victim 2, Adult Victim 3, the Mother of Adult Victim 1, and the Father of Adult Victim 1 to testify regarding their personal observations from the events of December 14-15, 2024, leading up to the death of Adult Victim 1 and the non-fatal overdoses of Adult Victim 2 and Adult Victim 3. The Father of Adult Victim 1 has stated to law enforcement that he had no involvement in arranging the drug transaction between the defendant and his daughter, nor did he provide his daughter with drugs on December 15, 2024. Therefore, the Father of Adult Victim 1 is not requesting an attorney as he has consistently maintained that he had not committed a crime.

**C. Law Enforcement Witnesses**

The Government intends to call Clackamas County Sheriff's Deputy Russell Palmeri to testify regarding his observations, evidence collection, and evidence submission. Additionally, the Government will be calling either Clackamas County Sheriff's Deputies Andrew Drakos or Trevor Wolf, and/or Oregon State Police Trooper Jered Coates to testify regarding the events leading up to the arrest of the defendant and search of the defendant's residence.

**D. First Responder Witnesses**

Depending on the court's rulings and possible stipulations, the Government may call additional emergency responders (fire fighters and/or paramedics) to testify regarding their observations and actions during their involvement on December 15, 2024. Of that group, currently, the government is only intending to call Clackamas Fire District paramedic Tyler Dickerson. Additionally, the Government may call hospital staff, including doctors, nurses, or a phlebotomist, to testify regarding their personal observations and actions as well as information from medical records regarding the events of December 15, 2024.

## V. STIPULATIONS

As of the date of this filing, the parties are continuing to discuss possible stipulations.

## VI. EVIDENTIARY AND LEGAL ISSUES

### A. Scope of Cross Examination and Impeachment Under Fed. R. Evid. 609

If defendant testifies at trial, the United States will seek to impeach him with evidence of his multiple prior felony convictions for Delivery of a Controlled Substance, Burglary, and Conspiracy to Deliver a Controlled Substances under Rule 609. Under Fed. R. Evid. 609(a), evidence of a defendant's prior felony conviction is admissible if the court determines that its probative value outweighs its prejudicial effect. *United States v. Browne*, 829 F.2d 760, 762 (9th Cir. 1987) (footnote omitted). In making that determination, courts look to five factors: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness' subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the defendant's credibility. *Id.* at 762-63. *See also United States v. Bagley*, 772 F.2d 482, 487 (9th Cir. 1985); *United States v. Cook*, 608 F2d 1175, 1185 n.8 (9th Cir. 1979) (en banc), *cert. denied*, 444 U.S. 1034 (1980), *overruled on other grounds in Luce v. United States*, 469 U.S. 38 (1984). Defendant is not entitled to a pretrial ruling on the admissibility of his prior conviction; this Court is not required to rule on this issue until it has heard defendant's testimony. *See Luce*, 469 U.S. at 43 ("to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify").[2]

///

[2] Where a district court is unsure of whether to admit or exclude evidence of a prior conviction, "the better procedure" is for the court to wait until it knows "the precise nature of the defendant's testimony." *Browne*, 829 F.2d at 762 (quoting *Luce*, 469 U.S. at 41).

The defendant's drug trafficking convictions carry strong probative weight with respect to defendant's credibility as a witness. His convictions also fall within the ten-year time limit in Rule 609(b), which runs from "the witness's conviction or release from confinement for it, whichever is later," because he was not released from confinement until 2017. Fed. R. Evid. 609(b); *see also Browne*, 829 F.2d at 763 ("By its terms, Rule 609 allows for admissibility of such a prior conviction even where the defendant has been released for up to ten years"). Given the critical nature of defendant's testimony, the importance of assessing his credibility can outweigh even prejudicial convictions. *See Browne*, 829 F.2d at 763-64. After all, defendant should not be allowed to "misrepresent himself to the jury, with the government forced to sit silently by, looking at a criminal record which, if made known, would give the jury a more comprehensive view of the trustworthiness of the defendant as a witness." *Cook*, 608 F.2d at 1187 (J. Goodwin, concurring).

**B. Business Records**

At this point, the government is not seeking to offer testimony from hospital personnel about Adult Victim 1, Adult Victim 2, and Adult Victim 3's treatment at the two area hospitals. However, should such testimony become necessary, the United States is prepared to offer the documents detailing their medical treatment, with accompanying certifications, that are admissible as public records and/or business records and are self-authenticating. The documents are medical records from both Providence Hospital (Adult Victim 2) and Kaiser Permanente (Adult Victim 1 and Adult Victim 3). These are business records under 803(6) and are self-authenticating under Rule 902(11).

///

///

**C. Expert Testimony**

The United States currently intends to call four expert witnesses in its case-in-chief, subject to reaching stipulations. Each of these experts are noticed in the United States' separately filed expert notice disclosure in compliance with Rule 16:

1. **Paramedic Tyler Dickerson**. Paramedic Tyler Dickerson will testify about his observations and treatment of the victims in the apartment. In addition, he will testify regarding the use of Narcan to revive two of the victims, and how Narcan only blocks opiates from affecting the person and is designed to rapidly reverse only an opioid or synthetic opioid overdose. Paramedic Dickerson will testify that when a person suffering a suspected overdose reacts positively to Narcan that indicates they were overdosing on either an opioid or synthetic opioid. Fentanyl is a synthetic opioid.

2. **Forensic Chemist Marcela Moenne-Loccoz**. Forensic Chemist Moenne-Loccoz will testify that about her analysis of various controlled substances to include those found in Adult Victim 1's bedroom, on the defendant, and inside the defendant's residence. Forensic Chemist Moenne-Loccoz will also testify the small baggie located in Adult Victim 1's bedroom, which Adult Victim 2 will testify contained the drugs obtained from the defendant, contained a mixture of cocaine and fentanyl.

3. **Forensic Chemist Crystal Hart**. Forensic Chemist Hart with OSP will testify about the quantity and type of drugs found in Adult Victim 1's blood.

4. **Medical Examiner Dr. Nicole Stanley.** Dr. Nicole Stanley will testify that Adult Victim 1 died from ethanol and mixed drug toxicity involving fentanyl and cocaine.

///

///

**D. Photographs and Recordings**

The United States intends to introduce into evidence photographs of the fentanyl, cocaine, tinfoil, straw, cellphone, and other items located inside Adult Victim 1's apartment. Additionally, the Government intends to offer photographs depicting cocaine and fentanyl found on the defendant and from the search warrant execution. Photographs should be admitted so long as they fairly and accurately represent the event or object in question. *United States v. Oaxaca*, 569 F.2d 518, 525 (9th Cir. 1978).

The United States also intends to introduce body worn camera footage from Clackamas County Sheriff's Deputy Russell Palmeri which details him responding to the scene of the overdoses and his recovery of the small plastic bag from Adult Victim 1's bedroom which contained cocaine and fentanyl. The Ninth Circuit has held that recordings are sufficiently authenticated under Federal Rule of Evidence 901(a) if sufficient proof has been introduced "so that a reasonable juror could find in favor of authenticity or identification," which can be done by "proving a connection between the evidence and the party against whom the evidence is admitted" and can be done by both direct and circumstantial evidence. *United States v. Matta-Ballesteros*, 71 F.3d 754, 768 (9th Cir. 1995), *modified by* 98 F.3d 1100 (9th Cir. 1996). For example, testimony that a recording accurately depicts what the witness saw or heard is sufficient to authenticate the recording. *See United States v. Smith*, 591 F.3d 974, 979-80 (8th Cir. 2010). Here, the footage will be authenticated by the officer who wore the associated camera, and the photographs will be authenticated by an officer who executed the search where the drugs and guns were found.

///

///

**E. Affirmative Defenses and Reciprocal Discovery**

Defendant has not given notice of any intent to rely on any defense of entrapment, duress, alibi, or any other affirmative defense. Thus, to the extent defendant attempts to rely on such a defense, the United States reserves the right to object and to request that the Court exclude defendant's affirmative defense.

The United States has requested reciprocal discovery. To date, aside from their notice of two potential experts, defense counsel has not produced any reciprocal discovery. If defendant attempts to introduce or use other documents at trial that have not been previously produced, the United States reserves the right to seek to preclude their use, presentation, and admission. *See* Fed. R. Crim. P. 16(d)(2) ("[T]he court may . . . prohibit the party from introducing evidence not disclosed."); *see also Taylor v. Illinois*, 484 U.S. 400, 415 (1988) (defendant's failure to comply with, or object to, government's discovery requests before trial justified exclusion of unproduced evidence).

## VII. FORFEITURE

While the Indictment contains a general forfeiture allegation, at this point there are no items subject to forfeiture.

///

///

///

## VIII. CONCLUSION

The United States respectfully requests leave to file supplemental trial memoranda before or during trial, as may become appropriate.

Dated: October 6, 2026.

Respectfully submitted,

SCOTT E. BRADFORD
United States Attorney

/s/ Scott M. Kerin
SCOTT M. KERIN, OSB #965128
Assistant United States Attorney

/s/ Steven Chamberlin
STEVEN CHAMBERLIN, TXSB #24095296
Assistant United States Attorney